IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LUTHER HAWKINS,

    Petitioner,

    v.

WARDEN, ROSS
CORRECTIONAL INSTITUTION,

    Respondent.

CASE NO. 3:23-cv-027
Judge Thomas M. Rose
Magistrate Judge Chelsey M. Vascura

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter has been referred to the uundersigned pursuant to 28 U.S.C. § 636(b) and this Court's General Order 22–05. Pending before the Court are the Petition (ECF No. 1); Respondent's Return of Writ (ECF No. 10); Petitioner's Traverse (ECF No. 14); and the state-court record (ECF No. 9). For the reasons that follow, the undersigned **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**. The uundersigned further **RECOMMENDS** that the Court decline to issue a certificate of appealability ("COA").

I.     **Statement of Facts and Procedural History**

The record reveals the following relevant facts and procedural history, as summarized by the Ohio Court of Appeals, Second Appellate District. *See State v. Hawkins*, App. Case No. 29013, 2021 WL 4347148 (Ohio App. 2d Dist. Sept. 24, 2021). The state appellate court summarized the facts as follows:

> **{¶ 1}** Luther Hawkins appeals from his convictions, following a bench trial, on one count of rape (Count 1 - under 13, by force), in violation of R.C. 2907.02(A)(1)(B),

a felony of the first degree, and ten counts of rape (force or threat of force), in violation of R.C. 2907.02(A)(2), also felonies of the first degree. The court sentenced Hawkins to 25 years to life (mandatory) on Count 1 and to four years each (mandatory) for the remaining counts, all to be served consecutively, for an aggregate term of 65 years to life. The court also classified Hawkins as a Tier III sex offender. We will affirm the judgment of the trial court.

{¶ 2} The victim of the alleged offenses was Hawkins's stepdaughter, who disclosed the abuse to her mother in the spring of 2019. Hawkins was indicted on six counts of rape (under 13, by force) on October 11, 2019. The court entered a not guilty plea on Hawkins's behalf, and Hawkins filed a motion to suppress on December 19, 2019. On January 2, 2020, the Montgomery County Department of Job and Family Services, Children Services Division, filed a motion to quash Hawkins's subpoena seeking the records of M.S., the victim herein. This motion to quash was later granted after an in camera review of the records.

{¶ 3} On January 10, 2020, Hawkins filed several notices and motions. He filed a notice of intent to introduce evidence of M.S.'s sexual history, with a request for a hearing. He also filed a motion in limine to prohibit the State from introducing text messages he had alleged sent to his ex-wife, the victim's mother, which included "a series of comments" by Hawkins regarding his "unrelated and immaterial sexual activities with other women." Finally, Hawkins filed a motion in limine to exclude evidence of his ex-wife's sexually transmitted disease (STD) and evidence of M.S.'s alleged STD or "speculation as to its origin."

{¶ 4} In July 2020, after a hearing, the court issued an order denying in part and sustaining in part Hawkins's motions in limine. The court noted that the parties had stipulated to Defendant's Exhibit 1, which consisted of the police report from the Dayton Police Department, text messages allegedly sent from Hawkins to his ex-wife, and M.S.'s medical records. The court concluded that evidence of M.S.'s prior sexual history was "unduly inflammatory and prejudicial" and would not be admitted at trial. The court found, however, that evidence of M.S.'s mother's sexually transmitted disease was relevant pursuant to Evid.R. 403(A) and that its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. The court reserved the right to reconsider its ruling if Hawkins were not provided medical information in the State's possession pertaining to this issue. Regarding the text messages sent to M.S.'s mother by Hawkins, the court concluded that, in light of M.S.'s prior sexual activity, the specific messages were inflammatory and that their potential prejudice outweighed their probative value. The court reserved its ruling on Hawkins's use of any of M.S.'s alleged psychological history because it was unable to discern what material Hawkins sought to use.

{¶ 5} On October 14, 2020, Hawkins filed a pro se request that a subpoena duces tecum be issued for both two individuals, other than Hawkins, with whom M.S.

allegedly engaged in sexual activity, "to pin point the 'origin of disease' and to prepare for a fair trial."

{¶ 6} In November 2020, Hawkins waived his right to a jury trial, and a bench trial commenced.

{¶ 7} D.H., M.S.'s mother and Hawkins's ex-wife, testified that she and Hawkins were married in March 2012, after dating for five months; shortly after they were married, they moved to an address on Hollenkamp Avenue. D.H.'s two daughters, M.S. and T.G., lived with them, but the girls were not related to Hawkins. D.H. stated that M.S. had been born in December 2002 and T.G. had been born in 2008. D.H. testified that she and Hawkins also had a daughter together, L.H., who was born in 2014. D.H. stated that she and Hawkins resided on Hollenkamp for about five years, then moved to Quentin Avenue, where they resided for two years, and then moved to Fifth Street and resided there until March 2019.

{¶ 8} According to D.H., Hawkins initially acted like a father toward M.S., but M.S. "would always have an attitude" around him. D.H. also stated that Hawkins exhibited a temper around the children. She testified that Hawkins had been alone with M.S. when she was at work, when she was in the hospital giving birth to L.H., and when she was in the hospital for 11 days another time. D.H. stated that, in March 2019, while in the car with M.S., M.S. began to cry "a hard cry like an emotional [one]," and D.H. "could tell something was wrong at that point." M.S. then told D.H. that Hawkins had been raping her.

{¶ 9} D.H. testified that she took M.S. to Children's Hospital on May 10, 2019. At that time, D.H. learned for the first time that M.S. had been previously diagnosed with chlamydia. D.H. had also been previously diagnosed with chlamydia on March 15, 2019, while married to Hawkins, and up to that point, she had not been sexually active with anyone else but him.

{¶ 10} On cross-examination, D.H. testified that M.S. never disclosed sexual abuse to her (D.H.) or to her own (M.S.'s) doctor while D.H. and Hawkins were together, and that D.H. never observed inappropriate behavior between Hawkins and M.S. D.H. stated that M.S. had exhibited behavioral problems in school and was often in trouble. For example, when M.S. was in the ninth grade and the family lived on Fifth Street, M.S. often skipped class to be with her friends in the school hallways. D.H. also stated that, in the 2017-2018 school year, M.S.'s grades were all F's and one C, and her grade point average was 0.15.

{¶ 11} M.S. was 17 years old and in the eleventh grade at the time of trial. She testified that she had been eight years old when she met Hawkins and that, initially, they did "a lot of family things," like bowling, skating, and shopping. When the prosecutor asked M.S., to outline her school years, she described them as follows: According to M.S., she went to ninth grade for the first time during the 2017-2018 school year at Belmont High School, when she was 14-15 years old; she lived on

Fifth Street at that time. M.S. stated that she repeated ninth grade at Summit Academy during the 2018-2019 school year when she was 15-16 years old; she also lived on Fifth Street at that time. Previously, M.S. had attended eight grade at Horizon Science Academy from 2016-2017, when she was 13-14 years old and lived on Quentin Avenue; attended seventh grade at Pathway in 2015-2016 when she was 12-13 years old and lived on Hollenkamp Avenue; and attended fourth, fifth and sixth grade in 2012-2015 at World of Wonder when she was 9-12 years old and lived on Hollenkamp Avenue.

{¶ 12} M.S. testified that Hawkins abused her "from fifth grade to ninth grade" when she lived on Hollenkamp Avenue, Quentin Avenue, and Fifth Street. M.S. stated that, when she was 11 and living on Hollenkamp Avenue, on a sunny day when her family was outside, Hawkins pulled her into a room and kissed her with a "tongue kiss," but she did not tell anyone about it. M.S. stated that, a couple of weeks later, while she was in D.H.'s room with Hawkins, he "put his mouth on my vagina basically"; she stated that her clothes were on, but Hawkins had pulled her pants down. According to M.S., she "was on the bed and he was like off the bed at the end of the bed." When asked if Hawkins's mouth "was doing anything or moving," M.S. responded affirmatively.

{¶ 13} M.S. testified that Hawkins also put his mouth on her vagina in "[her] room, the back room, maybe" at the Hollenkamp address. She testified:

> Q [PROSECUTOR]. Can you tell the Court everything you remember about that time it happened in your room?
>
> A [M.S.]. I don't remember - -
>
> Q. You don't remember a lot?
>
> A. No.
>
> Q. Were your pants on or off?
>
>     [DEFENSE COUNSEL]: Objection. Leading.
>
> BY [THE PROSECUTOR]:
>
> Q. Or something else?
>
>     [THE PROSECUTOR]: I guess that makes it not leading.
>
>     THE COURT: Sustain the objection. Rephrase - -
>
> BY [THE PROSECUTOR]:

Q. That time in your room that he put his mouth on your vagina - - let me ask it this way.

Was it skin-to-skin contact?

      [DEFENSE COUNSEL]: Objection. Leading.

      THE COURT: Overruled.

BY [THE PROSECUTOR]: Did his mouth directly touch the skin of your vagina?

A. Yes.

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT: Overruled. She never answered the first question actually so. Re-ask the first question (indiscernible).

BY [THE PROSECUTOR]:

Q. So that second time, in your room, were your pants - - were your clothes on or off or something else?

A. They were off.

Q. * * * How did they get off that time?

A. I really don't remember.

Q. You don't remember - -

A. (Indiscernible)

Q. - - how they got off, but you remember that they got off.

A. Yes.

Q. Is that correct?

A. Yes.

Q. * * * So is it accurate to say that there was nothing between his mouth and your vagina?

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT:  Overruled.

* * *

Q.  Is it accurate to say there was nothing between his mouth and your vagina?

A.  Right.

Q.  * * * Was it similar to that first time?  Was his mouth doing something on your vagina?

A.  Yes.

{¶ **14**} M.S. stated that Hawkins had also engaged in anal sex with her at the Hollenkamp Avenue address:

Q.  He used his private on your butt?

A.  Yes. * * *

Q.  * * * Did it touch on the outside?  Did his private go inside?

A.  It went inside.

Q.  Inside.

[DEFENSE COUNSEL]:  Objection.  Leading.

THE COURT:  Overruled.

BY [THE PROSECUTOR]: * * * And when you say his private, what part of his body do you mean by that?

A.  His penis.

Q.  * * * Did that happen one time on Hollenkamp or more than one time when you lived on Hollenkamp?

A.  More than one time.

* * *

Q.  Can you tell me where that happened?

A.  It would be in my mom's room or in my room.

Q.   When that would happen - - tell me everything you remember about it happening.

A.  (Indiscernible) he used Vaseline basically.

* * *

Q.  Did he put it on someone's body?

A.  Yes.

      [DEFENSE COUNSEL]:  Objection.  Leading.

      THE COURT:  Overruled.

BY [THE PROSECUTOR]:

Q.  Whose body did he put it on?

A.  His and mine basically.

{¶ 15} M.S. stated that she had been on her stomach with Hawkins behind her, and that it had been painful.  She stated that it happened both during the day and at night when D.H. was at work or out of the house.

{¶ 16} M.S. further testified:

Q.  Did he ever ask you to touch his body or did he have you do anything to his body?

A.  Yes (indiscernible).

* * *

A.  Put my mouth on his private part - -

* * *

Q.  Penis?

A.  Yes.

Q.  * * * Did his penis go inside your mouth?

[DEFENSE COUNSEL]:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY [THE PROSECUTOR]:  * * * On Hollenkamp, did that happen one time or more than one time?

A.  More than one time.

Q.  What room did that happen in?

A.  The back room, my room, their room.

* * *

Q.  Did you tell him no or did you try to stop any of this?

A.  I would say (indiscernible) the second one where he put his private in my butt, that's when I would tell him no.

{¶ 17} M.S. stated that when Hawkins put his penis in her mouth on Hollenkamp Avenue, she "had [her] mouth closed," but Hawkins forced it in, and that he had his hand on "him and on my head."

{¶ 18} When discussing the abuse at Quentin Avenue, M.S. testified:

Q.  * * * When you lived on Quentin, did [Hawkins] ever put his mouth on your vagina?

A.  Yes.

Q.  Did it happen one time or more than one time on Quentin?

A.  More than one time.

[DEFENSE COUNSEL]:  * * * Leading, Your Honor.

* * *

THE COURT:  * * * Overruled.

[THE PROSECUTOR]:  What rooms on Quentin would that happen in?

A.  Their room, living room.

Q.  When you lived on Quentin, did he put his penis in your butt?

A.  No.

Q.  Did he do anything similar?

A.  Basic like humping.

* * *

Q.  Tell me about that when he would hump you.

* * *

THE WITNESS:  Sometimes it'll be in the middle of the night and I wake up and he's on top of me while I'm laying on my stomach.  Like say if I was laying on the couch or something like that.  But his penis (indiscernible) basically like touching my skin.

BY [THE PROSECUTOR]:

Q.  So his penis would be touching your skin.

A.  Yeah.

Q.  But when you lived on Quentin, it didn't go inside.

A.  * * * No, it did not.

Q.  * * * And what about him putting his penis in your mouth?  Did that happen on Quentin?

A.  Yes.

       [DEFENSE COUNSEL]:  Objection.  Leading.

       THE COURT:  Overruled.

* * *

Q.  Did it happen more than one time?

A.  More than one time.

9

Q.  And what rooms would that happen in when he would put his penis in your mouth on Quentin?

A.  My room, their room and living room.

{¶ 19} M.S. testified that Hawkins continued to abuse her at the Fifth Street residence.  She stated that Hawkins put his mouth on her vagina there more than one time in her room and "their room."  Her testimony continued:

Q.  Did he put his penis in your butt - -

A.  No.

Q. - - on Fifth?

      [DEFENSE COUNSEL]:  Objection.  Leading.

      THE COURT:  Overruled.

{¶ 20} M.S. also testified:

Q.  On Fifth Street, when he put his penis in your mouth, did it happen one time or more than one time?

A.  More than one time * * *

Q.  Would you still try to close your mouth?

A.  Yes.

{¶ 21} As illustrated by some of these excerpts from the trial transcript, defense counsel objected throughout the prosecutor's direct examination on the basis that the State was leading M.S. throughout her testimony with "yes or no answers," which counsel described as "classic leading," and "with leading this witness to testify as they want her to."  Defense counsel moved for a mistrial.  The prosecutor disagreed that the questions had been leading, stating that "the victim was the first to bring up each of the sexual acts.  Those were not suggested to her.  But once she introduces those it is proper to ask her if they happened more than once and if they happened in more than one location.  And the fact that she is able to delineate and answer 'no' to some of these questions really establishes they're not leading questions and she's not easily led by them."  The trial court denied the motion for a mistrial.  It pointed out that the State had started by asking if these events did, in fact, occur; its questions did not surmise that the actions took place.

{¶ 22} When asked if any other sexual activity occurred on Fifth Street, M.S. responded: "[p]enetration and like taking my virginity."  She testified that Hawkins

"put his penis in my vagina" in "their room" when she was 14 years old and D.H. was in the hospital.  M.S. stated that she told Hawkins that it was painful and told him to stop.  She further testified:

Q.  Were you crying?

A.  Yeah - -

[DEFENSE COUNSEL]:  Objection.  Leading.

THE WITNESS:  Yes, I was.

THE COURT:  Overruled.

* * *

Q.  Did he - - before he put his penis in your vagina, before he took your virginity, had he ever tried anything like that before?

A.  No.

Q.  No?

That first time he tried it, he put his penis in your vagina?

Yes.

[DEFENSE COUNSEL]:  Leading.

THE COURT:  Sustained.

* * *

Q.  * * * Were there any other times that he put his penis in your vagina or was this the only time?

        * * *

A.  No, that wasn't the only time.

Q.  * * * Do you know how many times that happened?

A.  No, I don't know how many times.

Q.  More than once?

A.  More than once.

    [DEFENSE COUNSEL]:  Objection.  Leading.

    * * *

    THE COURT:  Overruled.

Q.  Were there other rooms it happened in?

A.  Yes.  The dining room, my room, their room.

Q.  When he took your virginity, do you know if he was wearing a condom?

A.  No.

    [DEFENSE COUNSEL]:  Objection.  Leading.

    THE COURT:  Overruled.

* * *

Q.  Okay.  On Fifth Street, was there anything else - - any other types of acts that happened?

A.  That was all.

{¶ 23} M.S. testified that Dr. Barnes-Lark was her doctor and that she (M.S.) had an appointment with Barnes-Lark in June 2018 to obtain birth control.  M.S. testified that Barnes-Lark contacted her after the visit and told her that she had tested positive for chlamydia.  M.S. stated that the doctor phoned in a prescription for her and explained that it consisted of two pills; M.S. told Hawkins, and he picked up the prescription, but he only gave her one of the pills.  M.S. stated that when she asked for the other pill, Hawkins told her he took the other pill for himself, "for his safety, too, so he won't have anymore either."

{¶ 24} The direct examination of M.S. continued:

Q [PROSECUTOR].  I want to go back, especially to some of these early times.

When we're talking about on Hollenkamp.  These first times that it's happening. You said that there were times that you said no.  You talked about saying no when he put his penis in your butt.

A.  Correct.

12

Q. And that didn't get him to stop.

    [DEFENSE COUNSEL]: Objection. Leading, argumentative.

    THE COURT: I'm going to sustain that - -

    [DEFENSE COUNSEL]: Move to strike.

    THE COURT: The Court will disregard it.

BY [THE PROSECUTOR]:

Q. Did you think you had a choice in the matter?

    [DEFENSE COUNSEL]: Objection.

    THE COURT: Overruled.

    THE WITNESS: Not at all.

**{¶ 25}** M.S. testified that Hawkins would wake up in the morning "yelling and screaming" because the house was not clean or because he was mad about something else. She described him as a "drill sergeant" and stated that she was afraid of him. M.S. testified that she decided to tell her mother (D.H.) about the abuse in March 2019, because they were moving and M.S. "felt like [she] was in a safe place enough to tell her." M.S. stated that after she did so, she felt "relieved," "didn't feel depressed anymore," and felt that "there was a big burden off [her] shoulders."

**{¶ 26}** M.S. testified:

Q [PROSECUTOR]. * * * I know we're talking about a lot of different incidents where this happened. How would these incidents end?

    [DEFENSE COUNSEL]: Objection.

    THE COURT: Overruled.

    THE WITNESS: I don't know what you mean by that.

BY [THE PROSECUTOR]:

Q. Like what would make him stop?

A. I don't know.

* * *

Q.  * * * Do you know what it means if I ask you if someone ejaculated?

[DEFENSE COUNSEL]:  Objection.  Leading.

[THE PROSECUTOR]:  I don't think it's leading to ask if it happened.  She can say yes or no and she has demonstrated she was able to say no when - - THE COURT:  Counsel approach.

{¶ 27} After a lengthy discussion at sidebar, the court sustained the objection, indicating "it was asked and answered" when M.S. "stated she did not know how these incidents or acts ended," and the prosecution could "move on from there,"

{¶ 28} The questioning proceeded as follows:

Q.  Were there other times that he did things to you and you cried[?]

[DEFENSE COUNSEL]:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

[DEFENSE COUNSEL]:  Calls for a yes or no answer, Your Honor.

* * *

THE COURT:  It's binary.  Objection overruled.

* * *

Q.  Did he ever tell you not to tell anyone?

A.  No.

[DEFENSE COUNSEL]:  Objection.  Leading.

THE COURT:  Overruled.

{¶ 29} On cross-examination, M.S. acknowledged that, in the course of the police investigation, she told Detective Fehrman that she had also engaged in sexual conduct with two other individuals.  With respect to her disclosure of the abuse to D.H., M.S. testified that she and her mother were in the car, pulling up to their new residence at the end of April 2019 when she disclosed Hawkins's abuse.

{¶ 30} The following exchange occurred:

Q. Well, as soon as your mom - -

* * *

Q. - - moved you guys to Notre Dame, she got pregnant with Mr. [F.'s] child, correct?

A. Correct.

Q. And that's around the same time you made these accusations against Mr. Hawkins, correct?

A. A couple months later, yes.

Q. Around the same time you made these accusations against Mr. Hawkins, correct?

A. Correct.

Q. * * * And you talked with your mother about these accusations, correct?

A. Correct.

Q. * * * And that was in spite of the fact that he had lived with you guys for seven years before you ever came up with these accusations, correct?

A. Correct.

Q. And that was around the same time your mother wanted to leave him, correct?

A. Right.

{¶ 31} Dr. Ladonna Barnes-Lark testified that she was a physician at the Charles Drew Health Center, that D.H. and M.S. were her patients, and that she had known D.H. since she was five years old and M.S. since birth. Barnes-Lark testified that on June 12, 2018, during a wellness checkup, she ordered that M.S. be tested for sexually transmitted diseases because she was at an age where the doctor "routinely order[ed] STI checks"; M.S. had also complained of abdominal pain. Barnes-Lark stated that her procedure was to obtain the patient's cell phone number, not the parent's, and call the patient when the results came back from the lab. Barnes-Lark testified that M.S. tested positive for chlamydia, and Barnes-Lark called M.S. and told her to take two prescription tablets by mouth to treat the disease. Barnes-Lark further testified that D.H. tested positive for chlamydia in March 2019.

{¶ **32**} On cross-examination, Barnes-Lark testified that, although she was a mandatory reporter of suspected abuse, she never had an occasion to contact law enforcement about M.S. when M.S. was between the ages of 11 and 16; M.S. never disclosed any sexual abuse during that time, and D.H. never expressed suspicions about Hawkins abusing M.S.

{¶ **33**} Dina Thurman, a pediatric nurse practitioner at Children's Hospital in the division of child advocacy who was trained to treat cases of childhood sexual abuse, stated that "about 95% of patients" will have no physical exam findings indicative of sexual abuse in the genital or anal region. Thurman stated that she examined M.S. in August 2019, and that M.S. had previously been seen by a physician in the emergency department in May 2019. Thurman stated that, when M.S. was seen in May 2019, "she had an exam that was concerning"; namely "there was a questionable absence of the hymen at six o'clock" noted by the emergency department physician, and the pediatric sexual assault nurse examiner also documented "an area of concern at the same area." According to Thurman, however, the "child abuse pediatrician" in the child advocacy division reviewed the photo documentation of the genital area from this examination and was unable to see the finding that was documented. The child abuse pediatrician recommended a follow-up medical exam to "better evaluate the findings of concern." Thurman testified that, when she examined M.S. in August 2019, she "was able to clarify * * * that there was a transection meaning an absence of hymenal tissue in the area that was found to be concerning in the emergency department." When asked if she was able to confirm that it was the same area of concern observed in May, Thurman responded that what she observed "was in the exact same location" and was "an absence of hymenal tissue." She explained that a transection "is a finding that is the result of penetration. It * * * can be penetration form various things. It's not a specific finding for abuse but it can be consistent with" abuse. Thurman testified that she asked M.S. if she had had prior consensual sexual activity, and M.S. responded affirmatively. Thurman stated that M.S. also told her that she had first had sex when she was 14 years old and that M.S. reported having one partner.

{¶ **34**} On cross-examination, Thurman testified that, in August 2019, M.S. had reported to her that M.S.'s last voluntary sexual contact had been two years earlier. M.S. told Thurman that she did not know who or what caused the hymenal transection. Thurman acknowledged that M.S.'s anal examination in May 2019 was normal.

{¶ **35**} Brenda Miceli, a pediatric psychologist at Dayton Children's Hospital, was designated by the court as an expert in child psychology, "specifically as it pertains to child and physical and sexual abuse." Miceli had never treated M.S., and she testified that her testimony was offered to generally explain the nature of child abuse disclosures. Miceli stated that, with respect to child abuse, "most disclosure takes a while" and is "delayed disclosure as opposed to immediate." Miceli also

testified that when someone experiences something multiple times, "it is harder to recall details of a particular incident." She testified that, while children can fabricate abuse, studies show that children often err by "underreporting information as opposed to giving additional information." Miceli stated that abused children generally exhibit three categories of behavior: "internalizing behaviors," such as anxiety and nightmares, depression, and self-harm; "externalizing behaviors," such as aggression, tantrums, and defiance; and "sexualized behaviors." She also stated that some kids describe feeling a sense of relief after they've disclosed.

{¶ 36} The State sought to present the testimony of Melissa Holbrook, a forensic interviewer who interviewed M.S. Defense counsel objected to the testimony, arguing that Holbrook's testimony would constitute "improper bolstering of [M.S.'s] testimony." Counsel asserted that M.S.'s statements during the interview were "testimonial in nature," that the interview was "taken at the behest of the Dayton Police Department," and that it was turned over to the Dayton Police Department for evidentiary purposes in preparation for trial. The court overruled the objection.

{¶ 37} Holbrook testified that she was employed by Dayton Children's Hospital as a Family Service Coordinator at CARE House, a child advocacy center. She stated that she conducted forensic interviews and made referrals for medical or mental health purposes. Holbrook stated that the goal was "to provide kids who come into CARE House a holistic approach to protect them or to advocate for them."

{¶ 38} Holbrook stated that a forensic interview is a "neutral," "non-leading" interview that reflects the child's developmental age or status and is conducted by someone who is trained and certified in forensic interviewing. She stated that the goal is to "assess the child's safety" as well as to assess whether the child has been a victim, and to make the appropriate mental health and medical referrals based on that interview.

{¶ 39} Holbrook interviewed M.S. on May 14, 2019, after she was referred to CARE House by the emergency department at Children's Hospital. Holbrook testified that doctors and nurses at the hospital were not trained to conduct forensic interviews. She also testified that M.S. disclosed sexual abuse during their recorded interview. Portions of the interview were played for the court, over defense counsel's objection (State's Exhibit 1).

{¶ 40} According to Holbrook, M.S. was a "very shy, quiet teenager" at the time of their interview. Holbrook stated that their interview was broken into sections: Holbrook initially introduced herself and explained her role and the "setup of the room"; she then tried to build rapport, went over the basic rules of the interview, and learned more about the child's family and home. Then, in "Stage 2" of the interview, Holbrook talked with the child about brought [sic] him or her to CARE House.

{¶ 41} Holbrook stated that M.S. was the first to bring up sexual abuse during Stage 2 of their interview, when Holbrook asked what brought her to CARE House. Holbrook stated that M.S. identified her abuser as her stepdad.  Holbrook testified that a child acknowledging being touched is a broad disclosure, and that for purposes of medical referral for further examination, it is relevant to learn the nature of the touching being reported.  She also testified that the identity of the abuser may impact the child's safety, noting that Hawkins was living in M.S.'s home prior to the interview.

{¶ 42} Defense counsel objected to Holbrook's "running narrative of the video being played."  Although the court noted its prior finding that the video of the interview was admissible because it was non-testimonial and relevant to mental health treatment, it agreed that a particular portion of the video was simply "rehashing" the victim's testimony.  The prosecutor asked to play a few more minutes of the video in which additional disclosures were made, but defense counsel strenuously objected.  Defense counsel pointed out that Holbrook was neither a doctor nor a nurse, that no medical personnel were present at the interview, and that M.S. had been seen by doctors and nurses at Children's Hospital a few days earlier, so M.S.'s statements could not be viewed as for the purposes of medical diagnosis and treatment under Evid.R. 803(4).  However, the court again found that the evidence was admissible, it stated: "there's no way for Ms. Holbrook to even consider providing treatment for the alleged victim for mental health purposes and medical treatment without hearing about the incident that took place."  The court also reiterated its finding that the interview was "nontestimonial in nature" and therefore admissible.

{¶ 43} Holbrook's testimony about the interview continued.  Holbrook was asked why, after M.S. reported that Hawkins touched her "private," Holbrook asked clarifying questions about the touching; Holbrook replied that "different things mean different things to kids," and that she (Holbrook) needed to understand what areas M.S. was talking about and what Hawkins used to touch her.  According to Holbrook, "the reason we do that is so that we can make sure that there's not anything additional that she needs to be seen medically for. * * * It could be a follow-up for needing additional lab work or testing done."  For example, Holbrook stated that learning that M.S. was touched by Hawkins's mouth helped her assess whether or not the touch was accidental or innocent.  She further stated that knowing whether M.S.'s clothes were on or off during the touching could impact potential referrals for treatment.

{¶ 44} A portion of the video reflected that M.S. reported that Hawkins had engaged in anal sex with her.  Holbrook stated that a report of anal penetration is conveyed to treating physicians since it may require distinct testing.  She also testified that if a victim reports having said no to the abuse, that information could inform a decision whether to refer the child for certain mental health counseling, such as trauma-based counseling.  Holbrook further stated that reports of multiple types of sexual activity over a considerable time period further implicate a referral for

trauma-based counseling. She stated that M.S.'s description of multiple types of sexual activity over a long period of time was relevant to future referrals.

{¶ 45} Holbrook testified that, after her interview with M.S., she referred M.S. to trauma-based counseling because M.S. reported multiple types of sexual abuse over an extended period of time. According to Holbrook, M.S. was "very emotional," which contributed to the assessment of the effect on her mental health and the referral for trauma-based counseling.

{¶ 46} On cross-examination, Holbrook acknowledged that, near the end of her interview with M.S., M.S. indicated that she could not have gotten chlamydia from anyone other than Hawkins because she had "never done anything else like this that she had done with" Hawkins. But at that time, Holbrook did not know that M.S. "had done things" with anyone else.

{¶ 47} Holbrook testified that a multidisciplinary team was involved in the forensic interview with M.S., including social workers, forensic interviewers, a medical team, prosecutors, victim advocates, child protection case workers, and law enforcement. She stated that she and M.S. were alone in the interview room in the course of the interview, and that Detective Fehrman of the Dayton Police Department, Melissa Lowe, a caseworker with MCCS, and Jessica Yang, a victim advocate, observed the interview from a separate room via video and audio recording. Holbrook testified that she gave a copy of the interview to Detective Fehrman afterward, "per our protocol."

{¶ 48} Holbrook reiterated that the purpose of the forensic interview was to "assess the child's safety, to discuss any type of victimization that they might've been through or might have witnessed. And then * * * the other purpose is to make sure that there's proper mental health or medical referrals made for any worries or concerns that the child has about themselves or their bodies."

{¶ 49} On redirect examination, when asked why only law enforcement was given a copy of the interview, Holbrook responded, "Per our protocol, the chain of command is our law enforcement party [sic] of the team and that is to protect the victim."

{¶ 50} Detective Zachary Fehrman of the Special Victims Unit of the Dayton Police Department, which investigates crimes against children, testified that he was one of five officers specifically assigned to CARE House. He responded to Dayton Children's Hospital when M.S. was taken there and, after speaking to responding officers, D.H., and M.S., he informed D.H. that she would be contacted to set up a forensic interview at CARE House. Fehrman testified that he was given the name of Luther Hawkins as a suspect. He stated that he received a copy of the forensic interview, which he kept through his investigation and the presentation of charges, then he gave a copy to the prosecutor to review. He stated that he also receives copies of forensic interviews in which no disclosures of sexual abuse occur.

19

{¶ 51} At the conclusion of the State's case, and over objection, State's Exhibit 1, the forensic interview, was admitted into evidence pursuant to *State v. Moore*, 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671. Defense counsel moved for an acquittal, which the court denied. Hawkins did not call any witnesses.

{¶ 52} As discussed above, Hawkins was found guilty of one count of rape of a child under 13, by force, and ten counts of rape (force or threat of force), all felonies of the first degree. Hawkins was found not guilty of five other counts.

{¶ 53} At sentencing, the court noted that it had considered the purposes and principles of sentencing and the seriousness and recidivism factors. The court found that consecutive sentences were necessary to protect the public from future crime and to punish Hawkins, and that they were not disproportionate to the seriousness of his conduct and to the danger he posed to the public. Thus, it imposed consecutive sentences totaling 65 years to life.

(ECF No. 9, PageID 148–73); *Hawkins*, 2021 WL 4347148, at *1–10.

Petitioner appealed his conviction to the state appellate court and raised the following four assignments of error:

[1] THE STATE DID NOT PRESENT ADEQUATE EVIDENCE TO SUSTAIN THE VERDICTS AND THE VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE.

[2] THE FORENSIC INTERVIEW SHOULD NOT HAVE BEEN PLAYED AT TRIAL.

[3] THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE STATE TO ASK LEADING QUESTIONS OF THE COMPLAINING WITNESS AND TO USE A BOARD AT TRIAL.

[4] THE TRIAL COURT'S SENTENCE OF 65 YEARS TO LIFE WAS CONTRARY TO LAW, EXCESSIVE AND CRUEL AND UNUSUAL PUNISHMENT.

(ECF No. 9, PageID 105.) On September 24, 2021, the state appellate court overruled Petitioner's four assignments of error and affirmed the state trial court's decision. (*Id.* at PageID 147–94.)

On December 16, 2021, Petitioner filed a Motion for Leave to File Delayed Appeal to the

Ohio Supreme Court (*id.* at PageID 196–204), which the Court granted on February 15, 2022.

(*Id.* at PageID 258.)  Petitioner, proceeding *pro se*, then raised the following three issues in his

memorandum in support of jurisdiction to the Ohio Supreme Court:

> Proposition of Law No. 1: The state did not present sufficient evidence at trial to sustain the verdicts and the verdicts were against the manifest weight of the evidence in violation of the appellants Due Process Rights under the Fourteenth Amendment to the United States Constitution.

> Proposition of Law No. 2: The trial courts sentence of 65 years to Life is contrary to law, excessive and constitutes cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution.

> Proposition of Law No. 3: The appellant multiple convictions and sentences are void as a matter of law where he was constructively deprived of his Sixth and Fourteenth Amendment right to the assistance of counsel at trial and on the appeal of right.

(*Id.* at PageID 260–73.)  On April 12, 2022, the Ohio Supreme Court declined to accept

jurisdiction.  (*Id.* at PageID 326.)

On January 25, 2023, Petitioner, proceeding *pro se*, sought a writ of habeas corpus

pursuant to 28 U.S.C § 2254.  (Petition, ECF No. 1.)  In his Petition, he raises the following

grounds for relief:

> **GROUND ONE:** THE STATE DID NOT PRESENT SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN THE VERDICTS AND THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

> **GROUND TWO:** THE TRIAL COURTS SENTENCE OF 65 YEARS TO LIFE IS CONTRARY TO LAW, EXCESSIVE AND CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT PURSUANT TO THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

> **GROUND THREE:** THE MULTIPLE CONVICTIONS AND SENTENCES ARE VOID AS A MATTER OF LAW, WHERE HE WAS CONSTRUCTIVELY DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO

THE ASSISTANCE OF COUNSEL AT TRIAL AND ON THE APPEAL OF
RIGHT.

(*Id.* at PageID 1–12.)

Respondent filed the state-court record on June 1, 2023 (ECF No. 9), and Respondent

filed a Return of Writ on June 2, 2023, arguing that Petitioner's claims should be dismissed

either on the merits or for procedural default. (ECF No. 10.) On June 26, 2023, Petitioner filed

his Traverse. (ECF No. 14.) This matter is now ripe for review.

## II. Standard of Review

State prisoners seeking habeas relief under 28 U.S.C. § 2254 are subject to the

Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Stermer v. Warren*, 959 F.3d 704,

720 (6th Cir. 2020) (citing *Northrop v. Trippett*, 265 F.3d 372, 376 (6th Cir. 2001). AEDPA

affords great deference to the state court's adjudication of a claim on the merits. *Stermer*, 959

F.3d at 720 (citations omitted). For a petitioner to be granted habeas relief, AEDPA requires that

the state court's merits adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Stermer*, 959 F.3d at 720–21.

A federal habeas court may not find a state-court adjudication to be "unreasonable"

simply because the court concludes in its "independent judgment that the [state court] applied

clearly established federal law erroneously or incorrectly." *England v. Hart*, 970 F.3d 698, 710

(6th Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). Rather, to be deemed

unreasonable, "the state court's ruling . . . [must be] so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  "Under these

rules, a state court's determination that a claim lacks merit precludes federal habeas relief so long

as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer*,

959 F.3d at 721 (citations and internal quotation marks omitted).  "This deference applies even

when the state court fails to explain its reasoning, in which case 'the federal court must

determine what arguments or theories . . . could have supported the state court's decision' and

afford those theories AEDPA deference." *Id.* (quoting *Sexton v. Beaudreaux*, 138 S. Ct. 2555,

2558 (2018) (per curiam) (cleaned up)); *Harrington*, 562 U.S. at 102.

A federal district court reviewing a petitioner's habeas claims is limited to the factual

record before the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  If, however, the

last reasoned decision by the state courts was found to be unreasonable or if the state court never

adjudicated a petitioner's claim "on the merits," then AEDPA deference does not apply, and the

claim is reviewed *de novo*.  28 U.S.C. § 2254(d); *Stermer*, 959 F.3d at 721 (citing *Maples v.

Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).  The reviewing federal court would then be free to

expand the record and consider additional evidence, even if not presented to the state court.

*Stermer*, 959 F.3d at 721–22 (citations omitted).

III.    **Discussion and Analysis**

Petitioner filed the instant federal habeas corpus action, raising three grounds for relief.

(Petition, ECF No. 1.)  Respondent asserts that the first two grounds are meritless and contends

that the third ground is procedurally defaulted or in the alternative, that the third ground is

meritless.  (Return, ECF No. 10.)  The undersigned addresses each claim below.

A.      **Claim 1: Sufficiency of the Evidence**

In his first ground for relief, Petitioner asserts that the State did not present sufficient evidence to support his conviction. (Petition, ECF No. 1.)

A criminal defendant's conviction is consistent with the Constitution only if the evidence presented at trial sufficiently justifies a reasonable factfinder to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). For sufficiency of the evidence claims raised in a federal habeas petition, the reviewing court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). Further, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* at 296–97 (quoting *Jackson*, 443 U.S. at 326).

State courts are afforded a "double layer" of deference for sufficiency of the evidence determinations, so long as the state court's decision was not unreasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). As the Sixth Circuit explained in *Brown*, deference must be given to the factfinder's conclusion of guilt because the question is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original) (citing *Jackson*, 443 U.S. at 319). Even if *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have found the essential elements, a federal habeas court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009); *Danielak v. Brewer*, 747 F. App'x 339, 340 (6th Cir. 2018) (citing *Coleman v. Johnson*,

566 U.S. 650, 651 (2012)). This is a "nearly insurmountable hurdle" for a habeas petitioner to overcome. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (citation omitted).

Moreover, a "conviction may be sustained based upon nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) (citing *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)); *see also Gipson v. Sheldon*, 659 F. App'x 871, 877 (6th Cir. 2016) ("Circumstantial evidence is sufficient to support a conviction as long as the jury is convinced beyond a reasonable doubt." (citations omitted)). A "federal habeas court reviewing the sufficiency of evidence to support a conviction need not rule out all possible interpretations of the circumstantial evidence." *Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. Feb. 28, 2002) (citing *Jamison v. Collins*, 100 F. Supp. 2d 647, 705 (S.D. Ohio May 10, 2000)). Thus, a "conviction may be based upon circumstantial evidence as well as inferences based upon the evidence." *Id.* at 647–48 (citations omitted).

As noted, Petitioner asserts that the State presented insufficient evidence to uphold his convictions. (Petition, ECF No. 1, PageID 4.) Respondent maintains that this claim is meritless under a "two-layered standard of review," pointing to *Jackson* as support. (Return, ECF No. 10, PageID 747 (quoting *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018)).) Respondent notes that in this case, the "factfinder obviously believed the victim," and cites to testimony that supported the convictions. (*Id.* at PageID 751–52.) A reviewing court, Respondent points out, "does not reweigh the evidence or redetermine credibility." (*Id.* at PageID 751 (citing *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003)).) Respondent concludes that this Court must afford deference to the state appellate court's decision in denying this claim on Petitioner's direct appeal. (*Id.* at PageID 753.)

In reply, Petitioner acknowledges that "this court will not reweigh the evidence or re-evaluate the credibility of witnesses." (Traverse, ECF No. 14, PageID 777.) Petitioner then appears to argue that the state trial court erred in denying a motion in limine and for allowing prosecutorial misconduct (*id.* at PageID 777–78 (citing ECF No. 9, PageID 76–85)), neither of which is claims raised in the instant action. (*See* Petition, ECF No. 1.) Petitioner also mentions that on cross-examination, D.H., the victim's mother, was asked about Petitioner going to Pittsburgh. (Traverse, ECF No. 14, PageID 778.) Petitioner attempts to support his claim with an affidavit from a professional colleague explaining a phone call Petitioner received from the victim during that trip to Pittsburgh. (*Id.*; ECF No. 14-1, PageID 783.) Further, Petitioner alleges that the evidence and testimony do not support being convicted of eleven counts of rape, pointing out that the victim testified about "oral and penetrated sex but she never specified a number of times." (Traverse, ECF No. 14, PageID 780.)

In denying this claim on appeal, the state appellate court noted the following:

{¶ **73**} Hawkins asserts that the testimony revealed that Hawkins and D.H. were having marital problems at the time of these accusations and that D.H. and M.S. wanted Hawkins "out of their lives for good." He points out that the State did not present any DNA or other forensic physical evidence. Hawkins also points out that M.S. did not report the abuse to her doctor over the years, and M.S.'s mother "did not see, or suspect, anything was wrong." Hawkins questions M.S.'s credibility and suggests that her "bias was evident," given that M.S. lied to Holbrook about her "sexual conduct with two other individuals, her poor performance and behavior at school, her hatred of Hawkins, her desire to have him out of her and her mom's life, [and] the delay (and timing) of the disclosure * * *." According to Hawkins, D.H. was diagnosed with herpes, and he reasons that, if D.H. was having a sexual relationship with Hawkins around the time that Hawkins raped M.S. vaginally, M.S. "would have contracted herpes"; Hawkins concludes that, because M.S. did not get herpes, "it is not medically possible that she was raped vaginally." Hawkins also argues that, although he was convicted of 11 counts of rape, there was no testimony or evidence to support 11 counts of rape.

{¶ **74**} In *Moore*, 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671, we stated:

When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

\* \* \*

When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

*Id.* at ¶ 57, 60.

{¶ 75} We have also stated:

The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 22 N.E.2d 212 (1967). "Because the factfinder \* \* \* has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

27

This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

*State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28.

{¶ 76} R.C. 2907.02 provides:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

* * *

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 77} The bill of particulars in this case set forth the following counts of rape of which Hawkins was convicted: pursuant to R.C. 2907.02(A)(1)(b), Count 1 occurred by means of cunnilingus on Hollenkamp Avenue; pursuant to R.C. 2907.02(A)(2), Counts 7 and 8 occurred by means of cunnilingus on Quinten [sic] Avenue; Counts 11 and 12 occurred by means of fellatio on Quinten Avenue; Counts 13 and 14 occurred by means of cunnilingus on Fifth Street; Counts 15 and 16 occurred by means of fellatio on Fifth Street, and Counts 17 and 18 occurred by means of penile-vaginal penetration on Fifth Street.

{¶ 78} As set forth above, M.S. testified that a couple of weeks after Hawkins kissed her at the Hollenkamp address, he pulled down her pants and put his mouth on her vagina when she was about 11 years old, in her mother's bedroom (Count 1). M.S. testified that Hawkins put his mouth on her vagina more than one time on Quintin [sic] Avenue, in "their room, living room" (Counts 7 and 8). She stated that Hawkins put his penis in her mouth at the Quintin Avenue address more than one time, in "[m]y room, their room, and living room" (Counts 11 and 12). M.S. testified that Hawkins put his mouth on her vagina at the Fifth Street address more than one time, in "[m]y room, their room" (Counts 13 and 14). She stated that he also put his penis in her mouth at the Quentin address more than one time (Counts 15 and 16). Finally, M.S. testified that Hawkins "put his penis in my vagina" on Fifth Street more than once, in the "dining room, my room, their room" (Counts 17

and 18). Thurman described a hymenal transection that as the result of penetration, and M.S.'s delayed disclosure, behavioral problems, and sense of relief upon disclosure were consistent with Dr. Miceli's general testimony regarding childhood sexual abuse.

{¶ 79} Having examined the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt, we conclude that a rational trier of fact could have found the essential elements of Hawkins's 11 offenses proven beyond a reasonable doubt. Further, having reviewed the entire record and having weighed the evidence and all reasonable inferences, we cannot conclude that the trial court lost its way in resolving conflicts in the evidence such that Hawkins's conviction must be reversed and a new trial ordered. The court had the opportunity to observe all the witnesses, and we defer to the trial court's assessment of credibility. Since Hawkins's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. His first assignment of error is overruled.

(ECF No. 9, PageID 185–89.)

Upon review of the state-court record, the undersigned finds that the state appellate court was not unreasonable in denying this claim on direct appeal. As noted, factual findings by the state trial courts are afforded deference in sufficiency of the evidence claims. *Brown*, 567 F.3d at 205; *White*, 602 F.3d at 710. With the double layer of deference afforded to state courts under the AEDPA, the undersigned is not persuaded that the state appellate court was unreasonable overruling this claim. *Davis*, 658 F.3d at 534 (noting that overcoming this deference is a "nearly insurmountable hurdle"). Although Petitioner asserts that the evidence did not support a conviction on eleven counts of rape and that the victim did not specify how many times the rapes occurred, the evidence is viewed in the light most favorable to the prosecution. *Wright*, 505 U.S. at 296 (citing *Jackson*, 443 U.S. at 319). The state appellate court addressed this same issue, noting that multiple acts occurred at multiple addresses. (ECF No. 9, PageID 188.) Moreover, the victim testified that some of the acts happened "[m]ore than one time," at each of the three different residences. (ECF No. 9-1, PageID 460, 463, 465, 467–69.) Viewing this evidence in favor of the prosecution, the state trial court had sufficient evidence to convict Petitioner on

eleven counts of rape because even circumstantial evidence can be enough to support a conviction. *See Saxton*, 547 F.3d at 606; *Dell*, 194 F. Supp. 2d at 647–48.

In the instant action, Petitioner attempts to bolster his claims through affidavits by various individuals. (ECF No. 14-1.) These affidavits, however, were not part of the state-court record. Thus, this Court is precluded from considering that evidence in assessing the reasonableness of the state appellate court's decision.[1] *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Further, a reviewing court will not reweigh evidence or witness credibility given the double deference afforded to the factfinder under *Jackson* and to the state-court decisions under AEDPA. *See Brown*, 567 F.3d at 205 (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)) ("In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury."). The trial court found sufficient evidence to convict Petitioner on eleven counts of rape—convictions that were upheld by the state appellate court. Notably, Petitioner was found "not guilty" on five other counts of rape. (ECF No. 9, PageID 92–93.) Based on the record before the state courts, the state appellate court was not unreasonable in denying this claim on Petitioner's direct appeal. *Stermer v. Warren*, 959 F.3d 704, 720–21 (6th Cir. 2020); *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020).

Accordingly, the undersigned recommends that this claim be **DISMISSED**.

### B.     Claim 2: Excessive Sentencing

---

[1] To note, Petitioner requested an evidentiary hearing in his Reply. (ECF No. 14, PageID 780–81.) A federal district court reviewing a habeas petition is confined to the record before the state courts, unless the last reasoned decision by the state courts was unreasonable. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Because the undersigned finds that Petitioner's claims are either meritless or procedurally defaulted, Petitioner's request for an evidentiary hearing is **DENIED**.

In his second ground for relief, Petitioner contends that his 65 years-to-life sentence is excessive, and cruel and unusual punishment under the Eighth Amendment. (Petition, ECF No. 1, PageID 5.)

The Eighth Amendment to the United States Constitution bars "cruel and unusual punishment." U.S. Const. amend. VIII. The Sixth Circuit has held consistently that a "sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)); *Adams v. Taskila*, No. 22-1244, 2022 WL 19298967, at *3 (6th Cir. 2022); *Graham v. Skipper*, No. 21-1672, 2022 U.S. App. LEXIS 14891, at *7 (6th Cir. 2022). "Only extreme sentences that are grossly disproportionate to the crime violate the Eighth Amendment." *Graham*, 2022 U.S. App. LEXIS 14891, at *7–8 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)) (internal quotation marks omitted).

In response to Petitioner's argument, Respondent contends that this claim is "meritless under the AEDPA," relying on the state appellate court's denial of this claim on Petitioner's direct appeal. (Return, ECF No. 10, PageID 757.) Respondent notes that Petitioner received the mandatory sentence of 25 years to life for his conviction under O.R.C. § 2907.02(A)(1)(b), pointing out that the Sixth Circuit has "consistently recognized the seriousness of crimes involving the sexual exploitation of minors." (*Id.* at PageID 756 (citing *United States v. Kniffley*, 729 F. App'x 406, 412 (6th Cir. 2018)).) Respondent also highlights that Petitioner was sentenced to only one year over the minimum sentence for each of his other convictions. (*Id.* at PageID 757.) In his Reply, Petitioner does not appear to address this claim any further. (*See* Traverse, ECF No. 14.)

In denying this claim on appeal, the state appellate court noted the following:

{¶ 81} Hawkins asserts that, insofar as he was 35 years old at the time of sentencing and "his first shot at parole is not until October 28, 2084, just shy of his 100th birthday," the sentence handed down by the trial court was "effectively a death sentence."

{¶ 82} We have observed:

> A "trial court has full discretion to impose any sentence within the authorized statutory range, and [it] is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.), citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus. On review of a felony sentence, an appellate court may vacate or modify the sentence "only if it determines by clear and convincing evidence" that the record of the case does not warrant the sentence, pursuant to the relevant statutes, or that the sentence is otherwise contrary to law. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.2d 1231, ¶ 1; *see also* R.C. 2953.08(G)(2). A sentence "is not contrary to law [if it falls] within the statutory range [and the trial court] expressly state[s] that it * * * considered the purposes and principles of sentencing [under] R.C. 2929.11 [and] 2929.12." (Citation omitted.) *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 32 (2d Dist.).

*State v. Schwyter*, 2d Dist. Miami No. 2019-CA-20, 2021-Ohio-2021-83, ¶ 8.

{¶ 83} R.C. 2929.14(C)(4) governs consecutive sentences and provides:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

[(c)] The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 84} As the State points out, Count 1 required a mandatory sentence of 25 years to life, and the other 10 rape convictions were felonies of the first degree which carried a maximum sentence of 11 years.   R.C. 2971.03(A)(1)(c);  R.C. 2929.14(A)(1)(b).  The State argues that, if the trial court had imposed maximum consecutive sentences across the board, Hawkins would have faced an aggregate prison sentence of 135 years to life.  But the trial court did not impose maximum prison terms on each of the 10 rape convictions; instead, it imposed four years on each, only one year over the minimum sentence.  The State also argues that the trial court properly imposed consecutive sentences because "the offenses were separated by time and location."

{¶ 85} Finally, "[w]here none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, syllabus.  "[F]or purposes of the Eighth Amendment and Section 9, Article I of the Ohio Constitution, proportionality review should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively."  *Id.* at ¶ 20.  Hawkins's sentence on Count 1 was mandatory, and the court's imposition of four-year sentences on the remaining counts was not grossly disproportionate to his offenses.

{¶ 86} Based upon the foregoing, we conclude that the trial court did not err in sentencing Hawkins to 65 years to life.

(ECF No. 9, PageID 189–92.)

Upon review of the state-court record, the undersigned finds that the state appellate court was not unreasonable in denying this claim on Petitioner's direct appeal.  As the state appellate court observed, a conviction under O.R.C. § 2907.02(A)(1)(b), Count 1 of the indictment (ECF No. 9, PageID 30), is a felony in the first degree and alone carries a mandatory sentence of 25

years to life imprisonment. O.R.C. § 2907.02(A)(1)(b), (B); O.R.C. § 2971.03(A)(3)(d)(i).

Further, the other ten convictions under O.R.C. § 2907.02(A)(2), Counts 7–8 and Counts 11–18

of the indictment (ECF No. 9, PageID 32–36), are also felonies in the first degree and each carry

a minimum sentence of three years and a maximum sentence of eleven years. O.R.C.

§ 2907.02(A)(2); O.R.C. § 2929.14(A)(1)(b).

      Petitioner was sentenced to the mandatory sentence of 25 years to life for Count 1. (ECF

No. 9, PageID 97.) Petitioner was also sentenced to four years for each of Counts 7, 8, and 11–

18, only one year over the *minimum* mandatory sentence for each count. (*Id.*) The state trial

court determined that the sentences would be served consecutively, pursuant to O.R.C.

§ 2929.14(C)(4), for an aggregate sentence of 65 years to life. (*Id.*) In support of Petitioner's

consecutive sentences, the state trial court offered the following rationale:

> The consecutive sentence is necessary to protect the public from future crime. The consecutive sentence is necessary to punish the defendant. Consecutive sentences are not disproportionate to the seriousness of Defendant's conduct and to the danger Defendant poses to the public. Defendant committed one or more of the multiple offenses while Defendant was under residential community sanction/non-residential sanctions. Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect public from future crime by Defendant.

(*Id.* at PageID 97–98.) The state trial court explained why Petitioner would serve consecutive

sentences, based on statutory requirements. Petitioner's aggregate prison term aligns with

Ohio's sentencing statutes, leading to a conclusion that his sentencing does not constitute cruel

and unusual punishment. *See Austin*, 213 F.3d at 302 (quoting *Organek*, 65 F.3d at 62); *Adams*,

2022 WL 19298967, at *3; *Graham*, 2022 U.S. App. LEXIS 14891, at *7.

      In analyzing this claim on direct appeal, the state appellate court noted that the state trial

court did not impose the maximum sentence for Counts 7, 8, and 11–18. (ECF No. 9, PageID

191.) The state appellate court pointed out that had the state trial court imposed the maximum

sentences, the aggregate prison term would have been 135 years to life. (*Id.*) Moreover, the

state appellate court concluded that imposing the mandatory sentence for Count 1 and four-year

sentences for the other counts was "not grossly disproportionate to [Petitioner's] offenses,"

highlighting that consecutive sentences do not constitute cruel and unusual punishment under

these circumstances. (*Id.* at PageID 191–92 (quoting *State v. Hairston*, 888 N.E.2d 1073 (Ohio

2008)).) Based on the foregoing, the undersigned finds that the state appellate court was not

unreasonable in denying this claim on direct appeal because its analysis comports with Eighth

Amendment precedent regarding statutory sentencing. *See Austin*, 213 F.3d at 302 (quoting

*Organek*, 65 F.3d at 62); *Adams*, 2022 WL 19298967, at *3; *Graham*, 2022 U.S. App. LEXIS

14891, at *7–8 (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring)).

Accordingly, the undersigned recommends that this claim be **DISMISSED**.

### C.      Claim 3: Ineffective Assistance of Counsel

In his third ground for relief, Petitioner asserts that both his trial counsel and appellate

counsel provided ineffective assistance of counsel in violation of the Sixth and Fourteenth

Amendments. (Petition, ECF No. 1, PageID 7.) Respondent maintains that this claim is

procedurally defaulted because Petitioner raised this claim for the first time to the Ohio Supreme

Court. (Return, ECF No. 10, PageID 761–63.) Respondent notes that any ineffective assistance

of trial counsel claim should have been raised first on appeal to the state appellate court because

the supporting facts were contained within the trial record. (*Id.* at PageID 763.) Additionally,

any ineffective assistance of appellate counsel claim, Respondent points out, should have been

raised first in a Rule 26(b) application. (*Id.*) Petitioner does not appear to reply to Respondent's

contentions regarding this claim. (*See* Traverse, ECF No. 14.)

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).  Petitioners must exhaust their claims in state court before seeking habeas relief from a federal court.  28 U.S.C. § 2254(b)(1); *Stermer v. Warren*, 959 F.3d 704, 720 (6th Cir. 2020).  If the prisoner fails to raise claims to the state courts, but still has an avenue open to present those claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)); *Picard*, 404 U.S. at 275–76. One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits,

neither may a federal court do so.  The Supreme Court has found that "contentions of federal law which were *not* resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  A "common example of a procedural default is a failure to raise a claim in state court in a timely manner."  *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

The Sixth Circuit applies a four-part test to determine whether procedural default bars a habeas petitioner's claim.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021); *Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007).  The *Maupin* test requires the following analysis:

> (1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138).

Constitutionally ineffective counsel may constitute cause to excuse a procedural default.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  In order to constitute cause, an ineffective assistance of counsel claim generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Id.* at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 489 (1986)).  Notably, this is because before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a

violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally

defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005).  The Supreme Court

explained the importance of this adequate and independent state ground requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-
> default doctrine in *Coleman*: "In the absence of the independent and adequate state
> ground doctrine in federal habeas, habeas petitioners would be able to avoid the
> exhaustion requirement by defaulting their federal claims in state court. . . .  The
> independent and adequate state ground doctrine ensures that the States' interest in
> correcting their own mistakes is respected in all federal habeas cases."

*Edwards*, 529 U.S. at 452–53 (quoting *Coleman*, 501 U.S. at 732).

As noted, Petitioner contends that both his trial counsel and appellate counsel provided

ineffective assistance of counsel.  (Petition, ECF No. 1, PageID 7.)  Petitioner also alleges that he

did not raise his ineffective assistance of counsel claims on direct appeal because "these issues

didn't come until after the judgment of conviction."  (*Id.*)  Respondent asserts that both

ineffective assistance of counsel claims are procedurally defaulted, and that Petitioner cannot

show cause and prejudice to excuse the default.  (Return, ECF No. 10, PageID 758, 760.)

Regardless, Respondent maintains, the ineffective assistance of counsel claims raised to the Ohio

Supreme Court are "utterly meritless."  (*Id.* at PageID 764.)  Respondent points out that one

claim focuses on reweighing the factfinder's credibility determinations and the other claim had

no factual support given a prosecutor's discretion in charging criminal defendants.  (*Id.* at

PageID 765–66.)

In seeking discretionary review from the Ohio Supreme Court, Petitioner raised two

ineffective assistance of counsel claims.  (ECF No. 9, PageID 271–72.)  Petitioner first raised the

following arguments in presenting his ineffective assistance of trial counsel claim:

> In the case sub judice, trial counsel failed to put the prosecutions to meaningful
> adversarial testing as required by "Cronic" where he failed to recognize, argue, and
> brief the double inference claim although he thought the evidence was insufficient

> to convict but for the wrong reasons. In addition, he failed to recognize, argue, and brief the double jeopardy issue even though as a properly licensed attorney of Ohio he was presumed to know the law. Cf. State v. Jackson, (1980), 64 Ohio St. 2d 830.

(*Id.* at PageID 271.) Petitioner then alleged that his appellate counsel "constructively deprived" him of effective assistance because his appellate counsel "failed to cite trial counsel's ineffectiveness." (*Id.* at PageID 272.)

Under Ohio's bifurcated system of appellate review, claims based on evidence within the trial record must be raised on direct appeal. *Stojetz v. Ishee*, 892 F.3d 175, 201 (6th Cir. 2018) (citing *Hand v. Houk*, 871 F.3d 390, 408 (6th Cir. 2017)); *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013). As Respondent points out, Petitioner did not raise his ineffective assistance of trial counsel claim on direct appeal to the state appellate court. Petitioner instead first raised this claim in seeking discretionary review from the Ohio Supreme Court. Both ineffective assistance of trial counsel claims raised to the Ohio Supreme Court are based on evidence contained within the trial record—the double jeopardy claim based on the indictment and the double inference claim based on the trial transcripts. Accordingly, Petitioner's ineffective assistance of trial counsel claim appears to be procedurally defaulted. *Maupin*, 785 F.2d at 138; *Buell*, 274 F.3d at 348.

If Petitioner seeks to excuse the procedural default of his ineffective assistance of *trial* counsel claim through the ineffective assistance of *appellate* counsel, then Respondent is correct that this claim was not properly preserved through a Rule 26(b) application. Ohio Appellate Rule 26(B) allows a criminal defendant to file an application for "reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel." Ohio App. R. 26(B)(1). An application under Rule 26(B) must be "filed in the court of appeals where the appeal was decided within ninety days" of the appellate court decision,

unless good cause is shown for a later filing. *Id.*; *Ramirez v. Richard*, No. 16-3106, 2016 WL

11848848, at *4–5 (6th Cir. 2016) (citing *Fautenberry v. Mitchell*, 515 F.3d 614, 639–40 (6th

Cir. 2008); *Goldberg v. Maloney*, 692 F.3d 534, 538 n.3 (6th Cir. 2012)).

Petitioner never filed a Rule 26(B) application to the state appellate court, he merely

raised his ineffective assistance of appellate counsel claim to the Ohio Supreme Court. (ECF

No. 9, PageID 260–61, 270–72.) A Rule 26(B) application would now be untimely, given that

the state appellate court decided Petitioner's direct appeal on September 24, 2021 (*id.* at PageID

147), well over the ninety-day requirement set forth in Rule 26(B). *See Fautenberry*, 515 F.3d at

639–40; *Goldberg*, 692 F.3d at 538 n.3; *Ramirez*, 2016 WL 11848848, at *4. The Sixth Circuit

has held that the failure to follow the filing requirements for Ohio Appellate Rule 26(B) is an

adequate and independent state ground to foreclose federal habeas review. *See, e.g.*, *Monzo v.

Edwards*, 281 F.3d 568, 578 (6th Cir. 2002); *Baker v. Bradshaw*, 495 F. App'x 560, 566 (6th Cir.

2012) (citations omitted); *Spring v. Gray*, No. 22-3421, 2022 WL 16640878, at *4 (6th Cir. 2022)

(citing *Parker v. Bagley*, 543 F.3d 859, 862 (6th Cir. 2008); *Taylor v. Buchanan*, No. 20-3120,

2020 WL 7586967, at *3 (6th Cir. 2020)).

Because Petitioner failed to preserve his appellate counsel ineffectiveness claim in a Rule

26(B) application, Petitioner cannot offer the ineffective assistance of appellate counsel as cause

to excuse the procedural default of his ineffective assistance of trial counsel claims. *See

Ramirez*, 2016 WL 11848848, at *4–5 (finding that ineffective assistance of counsel claims were

not exhausted in the state courts because the claims were raised only on discretionary appeal and

not in a Rule 26(B) motion); *Goldberg*, 692 F.3d at 538 ("[R]aising a claim for ineffective

assistance of appellate counsel in a discretionary appeal to the Ohio Supreme Court, without

addressing the claim through Ohio Appellate Rule 26(b) [sic], does not satisfy the exhaustion

requirement unless the Ohio Supreme Court addresses the issue on the merits.").  Further, Petitioner has not demonstrated how he was prejudiced.  Petitioner's ineffective assistance of trial and appellate counsel claims are procedurally defaulted, and Petitioner has failed to show cause and prejudice to excuse the default.  Because Petitioner failed to provide further facts to support these claims, the undersigned declines to speculate on the merits.

Accordingly, it is recommended that this claim be **DISMISSED** due to procedural default.

## IV.    Recommended Disposition and Certificate of Appealability Determination

For the foregoing reasons, the undersigned **RECOMMENDS** that Petitioner's claims be **DENIED**, and that this action be **DISMISSED**.  As noted above, Petitioner's request for an evidentiary hearing (Traverse, ECF No. 14, PageID 780–81), is **DENIED**.

Further, the undersigned **RECOMMENDS** that these claims do not warrant further consideration on appeal.  Pursuant to Rule 11 of the Rules Governing Section 2254 cases in the United States District Courts, a District Court must consider whether to issue a certificate of appealability ("COA").  A state prisoner who seeks a writ of habeas corpus in federal court does not have an automatic right to appeal a district court's adverse decision unless that court issues a COA.  28 U.S.C. § 2253(c)(1)(A).  When a claim has been denied on the merits, a COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).  To make a substantial showing of the denial of a constitutional right, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, 893 n.4 (1983)).

When a claim has been denied on procedural grounds, a COA may be issued if the petitioner establishes that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* The Sixth Circuit has noted that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect." *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Because no reasonable jurist would disagree with this conclusion, the undersigned **RECOMMENDS** that Petitioner not be granted a certificate of appealability. *See Moody*, 958 F.3d at 488; *Miller-El*, 537 U.S. at 336.

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within **FOURTEEN (14)** days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the District Judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of

the District Judge adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED**.


**DATED: January 30, 2024**                    /s/ *Chelsey M. Vascura*
                                    **CHELSEY M. VASCURA**
                                    **UNITED STATES MAGISTRATE JUDGE**